IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF WEST VIRGINIA

| | | |
|---|---|---|
| CARLENE LOCKLEAR, Personal Representative of the ESTATE OF MICHAEL LOCKLEAR, Deceased, | ) ) ) | Case No. 1:10 cv 164 |
| | ) | Jury Trial Demanded |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| MYLAN INC., et al., | ) ) | |
| Defendants. | ) ) | |
| | ) | |

| | | |
|---|---|---|
| BETH OLIVER, Personal Representative of the ESTATE OF MARK MENDENHALL, Deceased | ) ) ) | Case No. 1:10 cv 168 |
| | ) | Jury Trial Demanded |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| MYLAN INC., et al., | ) ) | |
| Defendants. | ) ) | |
| | ) | |

| | | |
|---|---|---|
| JEFFREY WINTERS, Personal Representative of the ESTATE OF LAURIE WINTERS, Deceased, | ) ) ) | Case No. 1:10 cv 186 |
| | ) | Jury Trial Demanded |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| MYLAN INC., et al., | ) ) | |
| Defendants. | ) ) | |
| | ) | |

|  |  |  |
|---|---|---|
| ROSE ANN MOWERY, Executrix of the ESTATEOF EDWARD MOWERY, Deceased , | ) ) ) ) ) | Case No. 1:10 cv 178<br><br>Jury Trial Demanded |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| MYLAN INC., et al., | ) ) | |
| Defendants. | ) ) | |

_____

|  |  |  |
|---|---|---|
| STEPHEN ROSENBERG, Personal Representative of the ESTATE OF TONI ROSENBERG, Deceased, | ) ) ) | Case No. 1:10 cv 169<br><br>Jury Trial Demanded |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| MYLAN INC., et al., | ) ) | |
| Defendants. | ) ) ) ) | |

## PLAINTIFFS' CONSOLIDATED MEMORANDUM IN RESPONSE TO DEFENDANTS' MOTIONS TO TRANSFER PURSUANT TO 28 U.S.C. § 1404[1]

_____

[1]     Defendants have moved to transfer the following five cases on identical grounds: (1) *Locklear v. Mylan, Inc.*, No. 1:10-cv-164; (2) *Oliver v. Mylan, Inc.* No. 1:10-cv-168; (3) *Rosenberg v. Mylan, Inc.*, No. 1:10-cv-169; (4) *Mowery v. Mylan, Inc.*, No. 1:10-cv-178; and (5) *Winters v. Mylan, Inc.*, No. 1:10-cv-186.  In the interest of judicial efficiency, Plaintiffs in these five (5) cases submit the following consolidated response, which fully addresses all of Defendants' arguments.  In the further interest of efficiency, Plaintiffs have filed the supporting declaration and exhibits to this response, as well as the accompanying motion to seal, in only the *Locklear* case.  Plaintiffs would respectfully refer the Court to those documents when it considers the Plaintiffs' consolidated response to the Defendants' motions.  To the extent Plaintiffs cite to any portions of Defendants' motions, Plaintiffs will cite to the *Locklear* motion.

Defendants' motions to transfer should be denied because Defendants come nowhere close to overcoming the presumption that the Northern District of West Virginia is an appropriate forum in which to try these cases.   The Northern District of West Virginia is in fact the **most** appropriate forum because no other federal district court in the country has more relevant evidence and witnesses within its borders and subpoena power.   Defendant Mylan Pharmaceuticals, Inc. is headquartered in Morgantown, West Virginia, and Defendant Mylan, Inc. is headquartered in Canonsburg, Pennsylvania, less than one hundred (100) miles from the courthouse.   Collectively, these two Defendants:  (1) distribute the Mylan fentanyl patch; (2) market the Mylan fentanyl patch; (3) conduct and oversee all clinical studies related to the Mylan fentanyl patch; (4) manage and coordinate all regulatory compliance for the Mylan fentanyl patch, including communicating with the FDA; (5) assisted in obtaining FDA approval for the Mylan fentanyl patch; and (6) oversee the contents of the labeling for the Mylan fentanyl patch. Given all of the critical functions that these two Defendants perform, it is unsurprising that the most important Mylan witnesses -- the ones likely to be called at trial -- are located in the Northern District of West Virginia.    Moreover, any live, non-expert testimony concerning the design of the Mylan fentanyl patch will be provided not by witnesses located in Vermont, as Defendants imply, but rather by witnesses in the Northern District of West Virginia.

Defendants are being disingenuous when they speculate that the trials of these cases will primarily depend on the testimony of nonparty witnesses, such as the decedents' treating physicians, local law enforcement, and first responders.  The parties' claims and defenses in these cases will primarily depend upon live testimony elicited from expert witnesses that have been retained by both parties, as well as testimony by the parties and their employees.  Indeed, at the only Mylan fentanyl patch case to go to trial to date only three (3) of the nineteen (19)

witnesses were nonparty witnesses, and those three (3) nonparty witnesses **were all called by the plaintiffs**.  In contrast, six (6) Mylan employees were called, almost all of whom were from West Virginia.  (The other witnesses were experts and party witnesses.)  As the following will show, these cases are in the most convenient jurisdiction in the country, and Defendants' motion should be denied.

## BACKGROUND[2]

Defendants design, manufacture, market, and distribute a powerful prescription narcotic—the Mylan Fentanyl Transdermal System patch (the "Patch").  (*Locklear* Compl. ¶¶ 15-16.)  Plaintiff alleges that his wife died from fentanyl intoxication as result of a defective Mylan Patch.  Thus, Plaintiff has brought this product-liability action that is focused on the "wrongful conduct of the Mylan Defendants."  (*Id.* ¶ 13.)  Specifically, Plaintiff contends that the Patch suffered from manufacturing defects, marketing defects, and design defects.  (Compl. ¶¶ 18-27.)  Plaintiff further asserts that the Mylan Defendants were negligent in, among other things, (1) providing misleading or inadequate labeling regarding the Patch, (2) not performing sufficient testing of the Patch to ensure it was safe for use, (3) failing to provide to the FDA information or data relevant to the safety of the Patch, (4) failing to conduct adequate post-marketing surveillance, (5) failing to conduct adequate monitoring and/or sufficient research regarding adverse events, (6) failing to provide adequate training, knowledge, or information to physicians, distributors, or sellers of the Patch, (7) failing to warn individuals adequately of the dangerous and lethal side effects of the product, (8) misrepresenting that the Patch is safe for use, (9) failing to list death as an adverse event, and (10) marketing the Patch for unsafe uses.  (*Id.* ¶¶

---

[2]    For purposes of Defendants' motions to transfer, the allegations in the five complaints are similar in all material respects.  Plaintiffs thus cite only to the *Locklear* complaint.

16, 23-24, 38.)  As shown below, the vast majority of evidence supporting these claims is located in the Northern District of West Virginia.

## ARGUMENT AND AUTHORITIES

### I.      Legal Standard

Defendants have sought a discretionary venue transfer pursuant to Section 1404, which provides: "for the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a).  This section "is intended to place discretion in the district court to adjudicate motions for transfer according to an 'individualized, case-by-case consideration of convenience and fairness.'"  *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29-30 (1988) (citing *Van Dusen v. Barrack*, 376 U.S. 612, 622 (1964)).   "The burden of proof rests with [Defendants]; there is a strong presumption in favor of [P]laintiff's choice of forum."  *Coady v. Ashcraft & Gerel*, 223 F.3d 1, 11 (1st Cir. 2000).

Courts have mentioned seven factors to be considered when weighing a convenience transfer:

> (1) ease of access to sources of proof; (2) the convenience of the parties and witnesses; (3) the cost of obtaining the attendance of witnesses; (4) the availability of compulsory process; (5) the possibility of a view; (6) the interest in having local controversies decided at home; and (7) the interests of justice.

*Alpha Welding & Fabricating, Inc. v. Heller, Inc.*, 837 F. Supp. 172, 175 (S.D. W. Va. 1993).

### II.     Defendants misstate Judge Goodwin's rulings in the Mylan cases that he transferred from the Southern District of West Virginia.

Before proceeding to an analysis of the relevant factors, Plaintiffs briefly address Defendants' mischaracterization of Judge Goodwin's rulings.  Defendants give the misimpression that Judge Goodwin has considered the factors discussed above and concluded

that cases involving Mylan fentanyl patches should never be brought in West Virginia. But Judge Goodwin resolved only the issue of whether Mylan fentanyl patch cases were properly brought in the **Southern District of West Virginia**. In assessing the factors, Judge Goodwin was particularly persuaded that transfer was appropriate because no evidence, testimonial or otherwise, was to be located in that district. *See, e.g., Urich v. Mylan, Inc.*, No. 2:10-cv-0030, 2010 U.S. Dist. Lexis (S.D. W. Va. Aug. 23, 2010) ("The plaintiff's choice of forum is substantially outweighed by the fact that absolutely no facts of significance in this case occurred **in this district**.") (emphasis added). Moreover, Judge Godwin did not have before him much of the evidence discussed below, which shows the extent of the culpable activity in the Northern District of West Virginia, as well as the location of the most relevant forms of evidence. Plaintiffs thus submit that Judge Goodwin's rulings should be afforded no weight as the Court considers Defendants' motions.

III.   **The sources of proof are most easily obtained in the Northern District of West Virginia because this is where the majority of culpable activity occurred and where most of the witnesses are located.**

No other federal district in the United State has more witnesses and evidence located within its borders and subpoena power than the Northern District of West Virginia. Defendant Mylan Pharmaceuticals is physically located within the district and Defendant Mylan, Inc. is less than one hundred (100) miles away and thus within the subpoena power of the Court. The evidence developed to date shows that these two entities make all significant decisions regarding the Mylan fentanyl patch and, as a result, almost all of the critical Mylan witnesses are in the Northern District of West Virginia. Moreover, the two most important employees of Defendant Mylan Technologies, who will offer testimony about the design of the Mylan fentanyl patch, are in the Northern District of West Virginia.

A.    **Almost all of the critical Mylan witnesses are in the Northern District of West Virginia, and Defendants' claims of the importance of nonparty witnesses are greatly exaggerated.**

The Court already has a roadmap as to how these cases are likely to be tried and who are the witnesses likely to be called; a Mylan fentanyl patch case was recently tried to jury verdict in November of 2010.  In the case of *Richardson v. Mylan, Inc.*, Case No. 09-cv-1041 (S.D. Cal.), the only Mylan fentanyl patch case to be tried to date, nineteen (19) witnesses were called by the parties.  Of those nineteen (19) witnesses, six (6) of them were Mylan employees.  Five (5) of those (6) Mylan employees lived and/or worked in Morgantown, West Virginia.  (Declaration of John Chapman ("Chapman Decl.") ¶ 2.)  The testimony of the single Mylan employee/witness not from West Virginia, John Hango, was presented to the jury via videotaped deposition testimony **by the plaintiffs.**  (*Id.*)  Below is a table identifying the Mylan employee/witnesses as well as the topics on which they were deposed prior to trial (if designated as a corporate representative).

| WEST VIRGINIA WITNESSES CALLED AT TRIAL[3] | | |
|---|---|---|
| **Witness** | **Entity/Title** | **Corporate Representative Topics** |
| Ron Selders | Mylan Pharmaceuticals, <br><br>Director of North America Product Safety and Risk Management | (1) Fentanyl patches which were defective or did not meet specifications, (2) Mylan's inspection and/or investigation procedures following the receipt of a complaint or field return regarding a Mylan fentanyl patch, (3) the outcome of all internal investigation procedures following the receipt of a complaint or field return of a Mylan fentanyl patch, (4) risk management plans utilized by Mylan with respect to Mylan fentanyl patches, (5) safety monitoring activities utilized by Mylan with respect to fentanyl patches, (6) pharmacovigilance plans, (7) surveillance activities, (8) reports of deaths associated with Mylan patches, (9) communications with the FDA concerning deaths and |

---

[3]    Defendants candidly acknowledge in their motions that three (3) of these five (5) witnesses, Michael Houghton, Ron Selders, and Russ Rackley, all reside in West Virginia.  (*See Locklear* Defs' Br. at 9.)

| WEST VIRGINIA WITNESSES CALLED AT TRIAL[3] | | |
|---|---|---|
| **Witness** | **Entity/Title** | **Corporate Representative Topics** |
| | | fentanyl patches, (10) Medwatch reports, and (11) policies for monitoring adverse events associated with Mylan patches. (Excerpts from Deposition Transcript of Ronald J. Selders at 17:19-23:3, Chapman Decl., Ex. 4.) |
| Russ Rackley | Mylan Pharmaceuticals, Vice-President of Pharmokinetics and Drug Metabolism | Not a corporate representative. |
| Frank Sisto[4] (former employee) | Mylan, Inc., Vice President of Regulatory Affairs and Global Head of Regulatory Affairs | Not a corporate representative. |
| Michael Houghton, | Mylan Technologies, Vice-President of Research and Development | (1) Bioequivalence of Mylan's fentanyl patch, (2) intended serum fentanyl concentration from Mylan fentanyl patches, and (3) design and specifications of Mylan patches. (Excerpts from Deposition of Michael Houghton at 26:5-33:22, Chapman Decl., Ex. 5.) |
| Kenneth Miller[5] | Senior Director for Transdermal Product Development | Not a corporate representative. |

To read Defendants' motion is to come away with the impression that Defendants intend to call at trial a parade of nonparty witnesses from the decedents' hometowns, including the decedents' pharmacists and treating physicians, local law enforcement officers, the local medical examiner, and the local toxicologist. (*See*, *e.g.*, *Locklear* Defs' Br. at 8.) But such claims are

---

[4] (*See* Deposition of Frank Sisto, 33:2-34:13 (explaining that he worked in Morgantown), Chapman Decl., Ex. 1.)

[5] (*See* Deposition of Kenneth Miller, 5:5-6 (explaining that he works in Morgantown), Chapman Decl., Ex. 3)

belied by the fact Defendants did not call **any** nonparty witnesses at the trial in *Richardson*.  Of the nineteen (19) witnesses, only three (3) of them were nonparty witness, and **all three (3) of them were called by the plaintiffs**. (Chapman Dec1. ¶ 2.)  The other sixteen (16) witnesses were party witnesses, and included experts retained by the parties.  (*Id.*)

Defendants' approach to trying fentanyl patch cases is similar to the approach of other fentanyl patch manufacturers that have defended wrongful death lawsuits involving their products.  For instance, in *Hendleson v. Alza Corp., et. al.*, Civil No. 05-CV-81116-CIV (S.D. Fla.), a product liability wrongful death case involving the Duragesic fentanyl patch, which was tried to verdict in June 2007, the defendants did not call a single treating physician or first responder as witnesses during trial—even though such persons were within the Court's subpoena power.  Nor did the defendants introduce their pre-trial testimony by transcript or video. (Chapman Decl. ¶ 4.)  Similarly, in *Hodgemire v. Alza, et. al.*, No. 2004-CA-001311 (Fla. Seminole County Ct.), another fentanyl death case involving the Duragesic fentanyl patch, which was tried in Florida late in 2008, Defendants again failed to call live, by video, or transcript the medical examiner, decedent's treating physicians, or the first responders.  (*Id.* ¶ 6.)  Most recently in *DiCosolo v. Alza*, *et. al.*, No. 04-L-5351, (Ill. Cook County Ct.), a three week trial ensued in Illinois state court involving a death from the Duragesic fentanyl patch.  Only one treating physician of the decedent (the prescribing doctor) was called to testify live—by the plaintiffs.  The medical examiner who performed the decedent's autopsy in that case was also called as a witness, again, by the plaintiffs.  Defendants, in contrast, failed to introduce the pre-trial testimony of or call at trial any treating physicians, first responders, or persons from the medical examiner's office.  (*Id.* ¶ 5.)

The case at bar is virtually identical to all of these cases in relevant respects. In every case, the decedent's body was found by someone; in every case, the decedent had a medical history that was thoroughly dissected by the defendants; and in every case, an autopsy was performed. Nonetheless, none of these defendants have deemed the testimony of the decedent's treating physicians, first responders or medical examiners sufficiently critical to elicit or otherwise introduce at trial. To the extent that local non-party testimony has been elicited, it has been limited to, at most, one or two witnesses that would likely be called not by the defendants, but by the plaintiffs. In short, there is no reason to believe that more than one or two witnesses residing in the states in which the decedents died will be called to testify at the trials in these cases.

The reality is this: these are complex pharmaceutical products liability cases which are primarily dependent upon two things: (1) the testimony of the Defendants' witnesses, primarily located in the Northern District of West Virginia; and (2) expert witness testimony regarding pharmacology, clinical and forensic pathology, toxicology, transdermal science, drug warnings, and manufacturing practices. As for the latter type of testimony, every single one of those witnesses will travel to testify live **no matter where the case is tried**. Accordingly, there is no gain in convenience by transferring this case.

> **B.    Defendants' internal documents reveal that much of their pharmacovigilance and regulatory functions with respect to their fentanyl patch are all conducted in Morgantown, West Virginia, by employees in Morgantown.**

Defendants' most recent Periodic Safety Update Report to the Food and Drug Administration pertaining to the fentanyl patch was issued by Mylan Pharmaceuticals Inc., (the Morgantown-headquartered Mylan entity) and signed by three Mylan Pharmaceuticals Inc. employees located in West Virginia. This document contains Mylan's analysis of adverse events

including lethal fentanyl overdoses that have occurred with patients using Mylan's patch.[6]  This document and others like it, such as complaint files and adverse event reports, are critical to Plaintiffs' claim that Defendants knew about the risk of lethal overdose and failed to warn of it.

During depositions of Defendants' witnesses, Plaintiff's counsel has also learned of other critical functions such as marketing, training of sales representatives, and testing pertaining to the patch that occurred at the Defendants' West Virginia facilities.  For example, testing and studies related to the Mylan fentanyl patch are conducted in Mylan Pharmaceuticals Inc.'s Pharmacokinetics Department, which is located in Morgantown, West Virginia:

> Q.    Have you had any involvement with any clinical studies involving fentanyl or fentanyl patches?
>
> A.    I might have been involved in discussion about design or intents or purpose or need for those kinds of studies.  But I don't have responsibility, never had responsibility for writing those protocols or approving them or executing them.
>
> Q.    Who handled that?
>
> A.    Those studies are all managed from our Morgantown office, and we have a Pharmacokinetics Department.
>
> Q.    The Pharmacokinetics Department, is that a department within Mylan Technologies, Mylan Pharmaceuticals, or Mylan, Inc.?
>
> A.    My understanding is it's a department within Mylan Pharmaceuticals.

(William Brochu Deposition at 14:5-22, Chapman Decl., Ex. 6.)

**[REDACTED]**

---

[6]    Because this document has been designated as confidential by the Mylan Defendants, Plaintiff's counsel attaches only the cover pages that show the Mylan Pharmaceuticals Inc. employees that are handling this critical regulatory and pharmacovigilance function out of Morgantown, West Virginia.  These cover pages are attached as Exhibit 22 to the Chapman Declaration.

**[REDACTED]**

Given all of the activity that occurs in West Virginia, Defendants cannot credibly claim that West Virginia has "few, if any interests" in these cases. (*Locklear* Defs' Br. at 2.)

### C. Mylan, Inc. is within the subpoena power of this Court and oversees and participates in all of the regulatory compliance for the Mylan fentanyl pain patch.

Defendants omit any discussion of Mylan, Inc.'s role with regard to the Mylan fentanyl patch, even though Mylan, Inc. is one of the three Defendants named in this suit. This is because any discussion of Mylan, Inc., leads to the conclusion that this case is properly brought in the Northern District of West Virginia. First, Mylan, Inc.'s headquarters are at 1500 Corporate Dr. Canonsburg, Pennsylvania, only ninety-three (93) miles from the courthouse, or an hour and a

---

[7] Defendants have repeatedly invoked postmortem redistribution as a defense in other cases involving the Mylan fentanyl patch, arguing that the lethal levels of fentanyl identified in the decedents' blood were not accurate or indicative of patch malfunction. This is perhaps Defendants' primary defense in these types of cases.

half drive.  (Chapman Decl., Ex. 10.)   Mylan, Inc. moved there only within the last three to four years and prior to that was headquartered in the same facilities as Mylan Pharmaceuticals in Morgantown West Virginia. (*See* Deposition of Frank Sisto, Chapman Decl. Ex. 2.)

**[REDACTED]**

**[REDACTED]**

Mr. Sisto's testimony concerning Mylan, Inc.'s involvement in all aspects of regulatory compliance is corroborated by Defendants' discovery responses in other cases, as well as documents produced in this litigation.  In the case of *Cunninghman v. Mylan, Inc.*, Case No. 8:08-CV-576-T-27 (M.D. Fla.), another wrongful death case involving a defective Mylan fentanyl pain patch, **two (2) of the five (5) officers** Defendants identified as having knowledge

relevant to the case were Mylan, Inc. officers, one of whom resides in West Virginia.[8] Defendants' documents show that Mr. O'Donnell participated in meetings with the FDA involving studies related to the Mylan fentanyl patch and regularly received product forecasts.[9] Mr. Bottini was involved in assessing adverse event reports related to the Mylan fentanyl pain patch, formulating risk management strategy for the patch, and filing reports with the FDA related to the patch.[10]   Moreover, it is clear that a host of Mylan, Inc. employees were responsible for overseeing the Surveillance Plan for the patch, which involved assessing safety data for purposes of FDA reporting.[11]   Because Mylan, Inc.'s employees are within the subpoena power of this Court, these cases should remain in the Northern District of West Virginia.

> ### D.    The only live, non-expert testimony about the design of the Mylan fentanyl pain patch will likely be from witnesses located in the Northern District of West Virginia.

Defendants give the misimpression that because the Mylan fentanyl patch was designed in a facility in Vermont by Mylan Technologies, much of the evidence is located there.  This is simply false.  First, Mylan Technologies is incorporated in West Virginia, and **every single one**

---

[8]    The two individuals are: (1) Peter B. Bottini, Executive Director of Product Safety Risk Management, a West Virginia resident, and (2) John O'Donnell, Ph.D., Strategic Scientific Advisor, a Florida resident. (*See* Mylan Defendants' Answers to Plaintiff's First Set of Interrogatories, Response to Interrogatory No. 1, Chapman Decl. Ex. 2.)

[9]    (*See, e.g.,* FDA Meeting Minutes, MYLAN-4669, Chapman Decl., Ex. 5; October 8, 2002, Email, MYLAN-0000100623,Chapman Decl. Ex. 11.)  Some of the documents prior to October of 2007 refer to Mylan Laboratories, Inc., but this is the same entity.  Mylan, Inc. was formerly known as Mylan Laboratories, Inc. until October of 2007, when it changed its name.

[10]    (*See, e.g.,* December 14, 2004, e-mail, MYLAN-148122, Chapman Decl., Ex. 12; June 28, 2006, e-mail MYLAN-25598, Chapman Decl., Ex. 13; June 13, 2005, e-mail Mylan-174570, Chapman Decl., Ex. 14.)

[11]    (*See* August 10, 2005, E-mail, Mylan-158606, Chapman Decl. Ex. 15.)

of the company's officers is located in either Morgantown, West Virginia or Canonsburg, Pennsylvania, all within the subpoena power of this Court.  (*See* Chapman Decl., Ex 16.)

Moreover, at the *Richardson* trial, three (3), non-expert Mylan witnesses were called to testify regarding the design of the Mylan fentanyl patch: (1) Kenneth Miller, (2) Michael Houghton, and (3) Gordon Flynn, Ph.D.  (Chapman Decl. ¶  23.)   Mr. Miller and Mr. Houghton, both employees of Mylan Technologies, live and/or work in Morgantown, West Virginia and were called live to testify at trial.   (*Id.*)   The remaining witness, Dr. Flynn, is located in Michigan, and **Defendants** presented his testimony to the jury via videotaped, deposition testimony. Accordingly, it is highly likely that any live, non-expert testimony concerning the design of the Mylan fentanyl patch (which will go to Plaintiffs' strict liability and negligent design claims) will be provided by witnesses located in this district.

### E.        The Mylan fentanyl patch is a West Virginia product.

It is unclear how Defendants can claim that this case has almost nothing to do with West Virginia when they publicly identify the Mylan fentanyl patch as a product of West Virginia. Defendant Mylan Pharmaceuticals, a West Virginia corporation headquartered in Morgantown, is the **only** Mylan entity identified in (1) the patient information insert for the Mylan fentanyl patch; (2) the full prescribing information packet for the Mylan fentanyl patch; and (3) advertising for the Mylan fentanyl patch.   (*See, e.g.,* Patient Information Insert and Full Prescribing Information Packet, Chapman Decl., Exs. 17-18 (identifying the Mylan fentanyl patch as a product of "Mylan Pharmaceuticals, Inc. Morgantown, WV 26505."); Mylan Advertisements, Chapman Decl. Exs. 19-20 (same).)   Indeed, Mylan Pharmaceuticals portrays itself to the world as the sole designer, manufacturer, marketer, and distributor of the Mylan fentanyl patch, and specifically lists on its website as one of its products the Mylan Fentanyl

Transdermal System, along with the full prescribing information, a guide to properly using the product, and pictures of the product.[12]  While Mylan Pharmaceuticals may have chosen to farm out the manufacture of fentanyl patches to a Mylan Technologies facility in Vermont, no mention is made of that entity in any of the aforementioned sources and thus any patient who uses the Mylan fentanyl patch (including the decedents') would believe it is a West Virginia product.  Given that Defendants cultivate the image that the Mylan fentanyl patch is a product of West Virginia, it is unclear how Defendants can assert that it is inappropriate or inconvenient to try these cases in West Virginia.

## IV.   The majority of the tortious conduct at issue occurred in Morgantown, West Virginia and Canonsburg, Pennsylvania, less than fifty miles from West Virginia.

This lawsuit is a product-liability action focused on the conduct of the Defendants occurring in West Virginia, Vermont, and Canonsburg, Pennsylvania, less than 50 miles from West Virginia.  Federal district courts have repeatedly held that in product-liability actions, the focus of the conduct is not on where the user was when he died, but instead on the design, marketing, testing, and manufacture of the product at issue.  *See, e.g.*, *Dwyer v. Gen. Motors Corp.*, 853 F. Supp. 690, 690 (S.D.N.Y. 1994) (denying motion to transfer product defect case to district where accident occurred, and stating "[i]n light of the fact that plaintiffs have based this action on theories of product liability, conduct which would result in findings of negligence, strict liability or breach of warranties would have occurred in the District where the majority of defendant's business decisions such as design, marketing, testing and distribution were made"); *Workman v. Johnson & Johnson*, No. 06-2523, 2007 U.S. Dist. LEXIS 46214 (D.N.J. June 26,

---

[12]      (*See* Mylan Pharmaceuticals Website, Miller Decl. Ex. 21 (describing itself as "a market leader in researching, developing, manufacturing, marketing and distributing generic pharmaceutical products in a variety of sophisticated dosage forms" and listing the Mylan fentanyl patch as one of its products).)

2007) (unpublished) (denying transfer of fentanyl-patch, product-liability case from the District of New Jersey (where the patch distributor resided) to Utah (where the decedent died) because the "evidence pertaining to the design, manufacture, marketing, and distribution of the [fentanyl] patch . . . is more relevant to the claims and defenses"); *Mohamed v. Mazda Motor Corp.*, 90 F. Supp. 2d 757, 776 (E.D. Tex. 2000) (denying defendant's motion to transfer in part because "the location of the accident revealing the allegedly defective product is a red herring for transfer analysis in cases where plaintiff is suing for the allegedly defective design and manufacture of the product").

Indeed, in a recent fentanyl-patch-product-liability case before the United States District Court for the District of New Jersey, the court analyzed and rejected transfer arguments identical to those made by the Defendants in this case. *See generally Workman*, 2007 U.S. Dist. LEXIS 46214. Specifically, the court rejected the contention that the occurrence of a decedent's death and the location of his medical providers in a state compelled a transfer:

> The evidence located in Utah [the state of death] concerns the decedent's medical treatment and death. Because this is a product liability, and not a medical malpractice action, the evidence in Utah does not concern the claims in issue. While the evidence in Utah may be relevant to some defenses, it is insufficient to support a transfer.

*Id.* at *7.

Defendants rely extensively on *Scott v. Life Ins. Investors Co. of Am.*, No. 2:07-CV-29, 2007 U.S. Dist. LEXIS 85934 (N.D. W. Va. 2007) to claim that these cases should be transferred because that is where the decedent's lived and died. *Scott*, however, was not a product-liability action, but it instead involved issues of life-insurance coverage pertaining to an individual who died in an automobile accident that occurred in the proposed transferee state of South Carolina. *Id.* at *2-4. The insurance policies at issue were entered by decedent and his wife when they

were residents of South Carolina.  *Id.* at *5-6.  After both the decedent's death and the life-insurance companies' denial of the decedent's wife's claim, she moved to West Virginia and filed suit here.  *Id.* at *6.  Thus, none of the alleged wrongful conduct in that action—unlike in this action—occurred in West Virginia.  *See id.*

Further, Defendants do not deny that the marketer and distributor of the patch, Mylan Pharmaceuticals is headquartered in West Virginia.  Affidavit of Brian Cuthbertson (Ex. A) ¶ 10.)  In *Workman*, the plaintiff likewise chose to sue in the home state (New Jersey) of the subsidiary that distributed the fentanyl patch, and not in the state where the patch was manufactured (California) or where the decedent died (Utah).  *Id.* at *2-3.  The *Workman* court found that lawsuit should stay in New Jersey because that was the home state of the distributor (just as West Virginia is the home state of the distributor Mylan Pharmaceuticals, Inc.).  *Id.* at *6-7.  In sum, the Mylan Defendants' reliance on *Scott* is misplaced because a product-liability action focuses on the conduct of the defendants, not the state of the decedent's death.  *See Workman*, 2007 U.S. Dist. LEXIS 46214 at *7.

**V.      Additional factors to be considered in a convenience transfer motion weigh in favor of keeping these cases in the Northern District of West Virginia.**

**A.      West Virginia is a more convenient forum for the parties and the witnesses.**

Defendants contend that a trial in the decedents' homes states, far from their home state of West Virginia, will be the most convenient location for the parties and the witnesses in this case.  As previously discussed, almost all of Defendants' critical witnesses are located in the Northern District of West Virginia or nearby in Canonsburg, Pennsylvania. Thus, the Northern District of West Virginia is the most convenient forum for Defendants.  Convenience for Plaintiffs is not at issue as Plaintiffs have chosen this district as their forum and will appear here for trial.

Defendants also contend that West Virginia will be inconvenient for the travel of any nonparty witness. (*Locklear* Defs.' Brief at 7.)  But the Mylan Defendants know that these nonparty witnesses will almost certainly not choose or be required to travel to West Virginia. Instead, the attorneys in this case can easily issue subpoenas out of the districts in the decedents' home states for videotaped depositions to be taken in those for any third-party witnesses they believe are relevant.   F.R.C.P. 45(a).   These videotaped depositions can, if relevant and otherwise admissible, be played at trial pursuant to F.R.C.P. 32(a)(4)(B).  Moreover, as set forth above, in  previous  fentanyl-patch-product-liability  trials,  very  few  third-party  witnesses  have actually been called.   In reality, having the trials in West Virginia will actually be more convenient for these third-party witnesses because they will only be compelled to testify once (at deposition) and not twice (at deposition and at trial).   Thus, this factor also weighs against transfer.

> **B.**     **The cost of obtaining the attendance of the witnesses will be the same regardless of where this case is tried.**

Defendants next contend that they will be forced to incur extra expense if these cases are not transferred to the decedents' home states because they will have to take "videotaped depositions of almost every witness that may have knowledge regarding the matter." (*Locklear* Defs' Br. at 11.)   As a practical matter, Defendants are already videotaping depositions of witnesses in other fentanyl patch cases that have been filed in the states where the decedents died.  Thus, this is an expense they choose to incur regardless of the location of litigation.

Defendants also argue that they will have to take two depositions, one for discovery and one for trial, of all the witnesses.  This assertion is belied by their conduct in *Woodcock v. Mylan, Inc.*, No. 2:09-0507 (S.D. W. Va.), a Mylan case that was not transferred from the Southern District of West Virginia and that was recently resolved by the parties.  In that case, Defendants

sought videotaped depositions of three Alabama witnesses that "may be used at the trial of this matter." (*See* Chapman Decl., Exs. 23-25.) Thus, contrary to their insinuations, Defendants are not taking non-videotaped discovery depositions followed by videotaped trial depositions when a decedent has died outside of West Virginia but the decedent's administrator files suit in West Virginia. Instead, they are taking one videotaped deposition for both trial and discovery purposes. Accordingly, Defendants' conduct in another similar case pending in West Virginia demonstrates that they will not incur any additional costs by litigating in West Virginia, and this factor also weighs against transfer.

### C.   If the Court transfers the cases, Plaintiffs will be unable to compel trial testimony of Defendants' witnesses.

Plaintiffs agree that there is no compulsory process to force the attendance of nonparty witnesses from decedents' home states to appear for trial. But Defendants do not dispute that these witnesses can be compelled to provide videotaped deposition testimony for use at trial, which is exactly what the Defendants chose to do in the *Woodcock* case. Moreover, should the trials move to the decedents' home states, Plaintiffs will have no mechanism to compel the attendance of Defendants' witnesses at trial. Notably, Defendants agree "to make all employees with relevant information . . . available for discovery purpose," in the decedents' home states but do not say which witnesses they deem "relevant," and they do not promise to make any witnesses available at trial. (*Locklear* Defs' Br. at 9.)

**D.     The possibility of viewing the scene does not weigh in favor of transfer.**

In this type of product liability case, viewing the "scene of the accident" is not relevant, and Defendants omit any argument on this factor in their brief, signaling that they believe this factor, too, does not weigh in favor of transfer.[13]

**E.     West Virginia has a substantial interest in having this matter decided here because the culpable conduct occurred in West Virginia.**

The Supreme Court has stated that when analyzing the "local interest in having localized controversies at home" the "court must consider the locus of the alleged culpable conduct, often a disputed issue, and the connection of that conduct to the plaintiff's chosen forum."  *See Van Cauwenberghe v. Biard*, 486 U.S. 517, 528 (1988).  While Defendants make the bald claim that the states in which the decedents' died are at the "epicenter" of these cases, they do not assert that any of the alleged culpable conduct took place in those home states.  (*Locklear* Defs' Br. at 13.)  In fact, none of the alleged culpable conduct took place in those states.  All of Plaintiffs' allegations concern the design, manufacture, testing, marketing, and distribution of the patch that took place in West Virginia, Pennsylvania, and Vermont.  And both Mylan Pharmaceuticals Inc. (the marketer and distributor) and Mylan Technologies Inc. (the manufacturer) are West Virginia Corporations.  As explained by the United States District Court for the District of New Jersey, this type of fentanyl-patch-product-liability case is appropriately brought in these defendants' home state:

> This is a product liability action.  The alleged culpable conduct relates to a flaw in the design, manufacture, marketing and/or distribution of the [fentanyl] patch. Some of this conduct took place in New Jersey where [one defendant] marketed, distributed, and managed the recall of defective [fentanyl] patches.  Other alleged culpable conduct took place in California, where [another defendant] designed

---

[13]     It would be difficult to posit a scenario under which the jury would be assisted by viewing the area where decedent applied her fentanyl patch or by viewing the area where the decedent died.

22

and manufactured the [fentanyl] patch.  None of the culpable conduct took place in Utah [where the decedent died wearing a fentanyl patch].  Therefore, Plaintiff's chosen forum has the closest connection to the alleged culpable conduct.

*Workman*, 2007 U.S. Dist. LEXIS 46214 at *10.

Defendants do not address the issue of where the culpable conduct occurred in this case. Instead, they focus primarily on a choice-of-law analysis.  (*Locklear* Defs.' Brief at 12.)  In so doing, they concede that District Courts in West Virginia have applied aspects of West Virginia law—specifically West Virginia's refusal to adopt the learned intermediary doctrine as a defense in product-liability actions—to cases where decedent's have died out of state.  *See Woodcock v. Mylan Inc.*, 661 F. Supp. 2d 602, 607-610 (S.D. W. Va. 2009).  Indeed, Judge Goodwin of the Southern District of West Virginia specifically noted that Defendants should expect to be subject to West Virginia's laws:

> Although Mr. Woodcock [the decedent who died while wearing a fentanyl patch in Alabama] was not a West Virginia resident, Mylan is.  As a West Virginia Corporation, Mylan has taken advantage of the laws of West Virginia, and it cannot now complain that it is being held to their consequences.  Presumably, Mylan has developed its business around an expectation that, as a West Virginia corporation, it will be subject to West Virginia tort law.

*Id.* at 609-610; *accord Vitatoe v. Mylan Pharms., Inc.*, No. 1:08CV85, 2010 U.S. Dist. LEXIS 27038, at *19-*23 (N.D. W. Va. Mar. 5, 2010) (barring the Defendants from raising the learned-intermediary defense in a Northern District of West Virginia case where the injury occurred in Louisiana because "the public policy of West Virginia bars the application of Louisiana's learned intermediary doctrine in this case").  Thus, this Court will be required to apply aspects of West Virginia law to this case, regardless of whether another state's law also applies.  Moreover, "[t]he 'governing law' factor is to be accorded little weight in a motion to transfer venue because federal courts are deemed capable of applying the law of other states."  *Prudential Sec. Inc. v. Norcom Dev., Inc.*, 1998 U.S. Dist. LEXIS 10569, at *17 (S.D.N.Y. July 15, 1998) (quoted in

*Astor Holdings, Inc. v. Roski*, 2002 U.S. Dist. LEXIS 758, at *39 (S.D.N.Y. Jan. 15, 2002)).  In short, because West Virginia has a substantial interest in regulating the culpable conduct that occurred in its state, this factor weighs against transfer.

>    **F.    In the interest of justice, these cases should remain in the Northern District of West Virginia.**

Proceeding in the Northern District of West Virginia will not cause any injustice to Defendants.  Most of their witnesses are here and their assertion that the case is based solely upon acts that occurred solely in the states in which the decedents died is simply untrue.  More importantly, the citizens of West Virginia do have an interest in policing the activities of two West Virginia corporations and in protecting themselves from the dangerous products they sell. Accordingly, the interests of justice weigh against transfer.

**<u>CONCLUSION</u>**

For all of the foregoing reasons, Defendants' motions to transfer should be denied.

>    Respectfully Submitted,
>
>    By:   */s/ Kathryn Reed Bayless*
>          Kathryn Reed Bayless, Esquire
>          WV State Bar No. 0272
>          **Bayless Law Firm PLLC**
>          1607 W. Main St.
>          Princeton WV 24740
>
>                and
>
>          Michael E. Heygood, TBN 00784267
>          James Craig Orr, Jr., TBN 15313550
>          Charles W. Miller, TBN 24007677
>          David E. Pitcher, TBN 24037285
>          **Heygood, Orr & Pearson**
>          2331 W. Northwest Highway, 2nd Floor
>          Dallas, TX 75220
>
>          **ATTORNEYS FOR PLAINTIFF**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that the foregoing document was filed using the Court's CM/ECF system which will generate an electronic copy upon the following counsel of record this this 9th day of February, 2011:

Clem C. Trischler, Esq.
Ryan King
Pietragallo Gordon Alfano Bosick & Raspanti, LLP
The Thirty-Eight Floor
One Oxford Centre
Pittsburgh, PA 15219

*/s/ Kathryn Reed Bayless*
Kathryn Reed Bayless, Esquire